## Louisville and Interurban Railroad Company v. Baker.

(Decided May 21, 1926.)

### Appeal from Shelby Circuit Court.

Carriers—Interurban's Liability to Passenger, who Had Miscarriage as Result of Walk and Excitement Occasioned by Being Carried Past Her Station, Held for Jury.—Interurban's liability to passenger, who had miscarriage as result of walk and excitement occasioned by being carried past station where she wished to get off, held for jury.

TODD & BEARD for appellant.

PICKETT, BARRICKMAN & KALTENBACHER for appellee.

OPINION OF THE COURT BY JUDGE GOODPASTER—Affirming.

This is an appeal from a judgment for $1,100.00, with interest from October 9, 1924, for damages alleged to have been caused by appellant's negligence in carrying appellee past her destination.

At 7:25 p. m. on August 25, 1923, appellee boarded one of appellant's interurban cars at 7th street at Shelbyville with the intention of leaving the car at Smithfield pike. Appellee testified substantially as follows:

When she entered the car and passed the conductor she informed him that she intended to leave the car at Smithfield pike; that before she reached the point of her destination she noticed the car was not stopping at her station and she told the conductor she wanted to get off there. "Here is where I want to get off." That he didn't say anything until the car stopped at the fair ground station; that she then said to him she wanted to get off at the Smithfield pike and that she had told him she did: that his response was: "I can't help that." That was the only answer that he would ever give her; that she then said: "I don't know how to get back to this place."

That she was never there before and his response was: "I can't help that." That she then said to him: "Won't you take me back; I don't know how to go through this place by myself, I don't know how." He responded, "I can't help that," and held his hand out for the pay; that she got off the car at the fair ground station and paid the conductor the fare; that he had not been to her to collect the fare before that time; that he made no effort to take her back to her station; that she come back to the Smithfield station through the railroad cut, the distance of which she estimated to be from "here to the Christian church." She was then asked this question: "Now I want to ask you this question: Did you go back through that cut as Mr. Todd said in his statement or did you go around the pike?" Answer: "I most certainly came through the cut." That it was a deep cut; that at the time it was dark; that she didn't know that there was a passway from the fair ground station back out to the state pike and around by which she could have come; that she had never been at the station before; that the conductor did not give her any information as to how she could get back to the Smithfield station; that she ran when she got to the deepest part of the cut and fell; that she had never been through there before; that it was dark; that in the fall she bruised her knee, hurt her side and hand and cut places on her right hand; that when she got out at the end of the cut she was met by her son, Ernest Baker, and William Baker, and that she was assisted in going from there to her home by her husband and son, a distance of about one-half mile. That she was in pain almost constantly until the time of her real sickness; that she had a flooding spell and on the 25th day of September, 1923, she had a miscarriage; that she has not been able to work or do anything in the meantime; that she tried to work but couldn't; that she did go to the office but would have to lie down; that she was taken to the hospital two days after the miscarriage; that Dr. Smith had been her regular doctor but Dr. Hughes was called into consultation before she was taken to the hospital; that she stayed in the hospital ten days; that at the time of receiving the injuries her weight was 192½ pounds and that she lost ten pounds weight; that she has not been able to attend to her household duties since her injuries as she did before; that at the time of the receipt of her injuries she was getting for her work from $20.00

to $23.00 per week; that she lost about ten weeks; that when she got off the car at the fair ground station there was no light; that it was dark and she didn't see any station; that there was nobody in the cut with her and that she was frightened.

Dr. Smith, who attended her, testified substantially as follows: That he was called to see her and found her very nervous and complaining of pains in her side and across her abdomen; that she said she had had a fall on the railroad to which she attributed the cause of her injuries. He was then asked these questions:

"Q. What was the result of that illness or those pains, what did it finally culminate in? A. She had a severe uterine hemorrhage.

"Q. Explain what you mean by uterine hemorrhage? A. It is an excess flow of blood from the womb.

"Q. When did that first make its appearance? A. I was called on the night of the 25th of September after her injuries.

"Q. Was she suffering from that hemorrage at that time? A. Yes, sir.

"Q. How was she suffering then, doctor? A. Intense pains, and with the hemorrhage of course the bleeding was the main trouble; she had bled very freely, was at the point of exhaustion.

"Q. Do you know how long she had been suffering from that intense pain previous to your visit on the 25th of September? A. I don't know, I don't remember, you see we had to work very fast to stop this hemorrhage, I don't remember whether there was much said about how long it had been. I can't answer that in particular.

"Q. Who was with you at the time you were called there on the night of 25th? A. I called Dr. Hughes to assist me.

"Q. Why did you call Dr. Hughes? A. Because I needed assistance to stop that bleeding, pack the uterus and stop the bleeding.

"Q. When did the miscarriage actually occur? A. The next morning, I believe; I took the placenta from the womb, the afterbirth.

"Q. What was her suffering in the meantime and at the time? A. She seemed to be suffering

quite a little. I was there two or three times during the night, and early the next morning. She had those crampy pains that we usually have in those cases.''

He then stated that he took her to the hospital as soon as he could make arrangements; that he saw her twice daily for four or five days, maybe in all fourteen or fifteen times; that she was confined at the hospital ten days; that in his opinion the miscarriage was the result of her injuries; that his bill for his services was $44.00.

Dr. W. P. Hughes was introduced as a witness and testified, in substance, as follows: That when he was called to see her she was flooding, passing a great deal of blood, to such an extent that Dr. Smith called him in for assistance, helping control the blood; that from the history of the case he judged that her miscarriage was due to either the fall or excitement, the excitement really as much as the fall. He was asked this question:

"Q. When you saw Mrs. Baker on the night of the 25th, or whenever it was you saw her, describe her suffering to the court, that is, whether they were slight or intense suffering. A. She was in a good deal of shock from the hemorrhage, that is, her pulse was weak; she really wasn't running or anything because she was partly unconscious at the time; her face was blanched and white; she had all the symptoms you get from hemorrhages, a good deal of blood, blood on the bed and all around, and as I recall I don't remember of her making any outward demonstration because she was partly unconscious when I saw her.''

Ernest Baker and William Baker each testified substantially as follows: That they promised to meet the appellee at the Smithfield pike on the arrival of the car; that they were present when the car passed carrying appellee to the fair ground station and waited for her return to the Smithfield pike, and that they saw her come out of the cut at that point; that she was assisted home by witness, Ernest Baker, and her husband, each holding her as they walked along.

The appellant introduced as a witness W. E. Lowry, who testified substantially as follows: That he was the conductor on the interurban car on the evening of August 25, 1923, that left Shelbyville for Louisville about 7:25; that a lady got off the car that night at the fair grounds;

that he had learned that she was the plaintiff, Mrs. Pearl Baker; that the first indication he had she wanted to get off the car was after passing Smithfield pike going toward the fair grounds; that a gentleman raised his hand and gave him the motion that there was, and he happened to notice a lady wanted to get off and thought she wanted to get off at the fair grounds; that he gave the signal to stop the car at the fair grounds; that it was stopped at that place; that before reaching Smithfield pike there was no signal of any kind given him to stop; that after he went back where the lady got off at the fair grounds he learned that she wanted to get off at Smithfield pike; that she told him she wanted to get off there; that she didn't tell him where she wanted to get off when she got on the car; that when she got off at the fair grounds she said she wanted to get off at Smithfield pike; that he told her that was the fair grounds and that she got off and went back of the car and on to the state pike and turned toward Shelbyville; that she didn't go through the cut along the railroad track to the Smithfield pike; that she did not ask him to take her back to the Smithfield pike; that she said nothing about being sick or wanting to be taken back to the Smithfield pike in any way.

The appellant introduced Sam Baker, who testified substantially as follows: That he remembered the occasion when Mrs. Baker got off the car at the fair grounds; that he saw Mrs. Baker on the car; that the first he learned that Mrs. Baker wanted to get off the car was just after the car got over the Smithfield pike; "she jumped up and asked where she was at and I told her blowing for the fair grounds, just went over the Smithfield pike, just beyond the Smithfield pike," and she said she wanted off at the Smithfield pike; that the conductor had gone to the front end of the car to collect fares but came back and he (witness) motioned for him to ring down and he rang down for the fair grounds; that she got off the car at the fair grounds; she said she wanted off at the Smithfield pike, and the conductor told her she should have told him or paid her fare and told him where she wanted off, and he stood on the back end of the platform and collected the fare and Mrs. Baker told him she didn't pay until she got off. The conductor told her he didn't know she wanted off at Smithfield pike. When she got off the car she came around back of the car, came back to the pike and when the car left she was on the

state pike turned to her left back toward Shelbyville; that it was light enough there for you to see her when she went back of the car and went on to the state pike; there was a machine that was on the pike at the time and that lighted all up and down the pike.

The appellant moved the court to peremptorily instruct the jury to find for it at the conclusion of appellee's case and also at the conclusion of all the testimony. The court overruled said motions and refused to give the peremptory instruction either at the close of plaintiff's testimony or at the close of all the testimony, to which the appellant objected and excepted.

But two instructions were given by the trial court. On this appeal no objection is made as to their form, the contention of the appellant being that they should not have been given at all because it was entitled to a peremptory instruction.

In support of this proposition, in his brief counsel for appellant says: "The fact that appellant's conductor carried beyond her destination without fault on his part, and discharged her at the fair grounds station, at a safe place, is not the proximate cause of the injuries which appellee complained of. This doctrine has been well settled by an unbroken line of cases."

Under instructions not complained of as to form, the jury found from the evidence that appellant negligently carried the appellee beyond her destination and therefore was in fault. The evidence of appellee and her physicians shows that she was very seriously injured and the only question involved is whether or not her injuries were the proximate result of the alleged negligence.

In the case of the Louisville and Interurban Railroad Company v. Bullock, 199 Ky. 194, where the appellee sued the appellant and recovered judgment of $500.00 damages for carrying her beyond her destination, which increased the distance she had to walk to reach her home 987 feet, resulting in a severe spell of asthma, this court said: "Taking into consideration the fact that the attack of asthma did not come on immediately after the walk up the hill, but did come on after the nervous excitement incident to appellee being carried past her destination, and after the additional walk which she was required to make, we conclude that it was for the jury to say whether appellant's negligence was the proximate cause of her weakened condition and subsequent suffering, and if such was the case, we are not prepared to say

that the verdict is so excessive as to strike the mind at first blush as having been superinduced by passion or prejudice.''

In the case of Brown v. Chicago, Milwaukee & St. Paul Railway Company, 54 Wisconsin 342, it was held that the defendant was liable for the injury to a pregnant woman passenger on a railway train who was carelessly directed by the brakeman to leave the train at a station three miles short of her destination on a cloudy night when she could not see the station and being a stranger there had to walk until she reached her destination, the exercise having brought on a miscarriage and sickness. The opinion in part reads as follows:

''Upon the findings of the jury in this case it appears that the defendant was guilty of a wrong in putting the plaintiffs off the cars at the place they did; that in order to protect themselves from the effects of such wrong they made the walk to Mauston; that in making such walk they were guilty of no negligence but were compelled to make it on account of the defendant's wrongful act; that on account of the peculiar state of health of Mrs. Brown at the time she was injured by such walk. There was no intervening independent cause of the injury other than the act of the defendant. All the acts done by plaintiffs and from which the injury followed were rightful on their part, and compelled by the act of the defendant. We think, therefore, it must be held that the injury to Mrs. Brown was the direct result of the defendant's negligence and that such negligence was the proximate and not the remote cause of injury within the decision above quoted. We can see no reason why the defendant is not equally liable for an injury sustained by a person who is placed in a dangerous position, whether the injury is the immediate result of a wrongful act or results from the acts of the party in endeavoring to escape from the immediate danger.''

No error prejudicial to the substantial rights of appellant having been committed, the judgment appealed from is affirmed with damages.